Florida. My name is Aaron Penner. I will be addressing the issues that are raised in the monopolization brief, and Mr. Hume will be addressing the issues in the trial errors brief. And I want to spend most of my time focused on the product hop issue, the product switch issue, because if the district court got that wrong, as we believe it did, the entire case, including the pay-for-delay case, has to go back to retry plaintiff's claims here. And I want to start with the facts, because they're quite remarkable. Gilead recognized as early as 2003 that to protect its monopoly from generic competition, it would have to switch patients to TAF-based drugs before its TDF-based drugs faced generic competition, before generic TDF-based drugs entered. And it hatched a scheme to do that by misrepresenting to providers and patients the purported safety benefits of TAF over TDF. Now Gilead estimated internally that only a small minority of patients would actually benefit from the differences between TAF and TDF and their impact on renal and bone factors. But there's an internal document, it's at the 23 excerpts of record at 5698, and what Gilead says in their business plan is, what must be believed is that TAF products have significant improvements in clinical value relative to TDF for all patients. Now that phrase, clinical value, is very important because Gilead did not have evidence that there was an improvement in clinical value for patients. Is it your understanding that it's predictable in advance who the patients are that will benefit? At that point, yes, Your Honor, there were tests that were described in Gilead's internal documents about which patients did have indications of vulnerability for renal effects or bone effects. But couldn't people develop renal problems later even if they didn't have one of those? I'm trying to understand how it was misleading to say some patients benefit from this when you're going to take it for a long time and maybe you are going to eventually become one of those patients. Well, a couple of things, Your Honor. That I think was the essence of the district court's error, was that the district court resolved factual disputes in a way that drew an inference in favor of, or drew an inference against the plaintiff. So when the district court said, and this is on page eight, I think it's page 17 of the district court's opinion at 5788 of the excerpts of record. And what the district court said was, along the lines that Your Honor is asking, even to a patient without an acute bone or renal condition, there are implicitly some benefits to TAF over TDF. The district court didn't cite anything for that statement. And our experts said that was not correct. And what our experts said was that for many patients, there were no benefits to TAF over TDF. And I want to emphasize in that regard. Can I just stop there? Sure. Because I had understood you were suggesting that Gillian's advertising was not actually false. But as you're presenting the argument now, it almost transforms it into not misleading, but false. Would you clarify that? Certainly, Your Honor. I don't think that we would, if the question were a fraud claim, that you can point to something that is literally false. For one thing, many of the statements that we're referring to are in internal documents. They're not statements that were made externally. I can return to why it's appropriate to rely on those internal documents. But as to this point, I think where you can really see why this was so misleading is when you think about the use of Truvada for PrEP and Gilead's efforts to substitute Dyscovy. I know there's a lot of drug names in this case. But essentially, there was only one drug, Gilead, I should say only one Gilead drug that was approved for PrEP, and that was Truvada. Dyscovy was introduced. It's the analogous drug that's TAF-based instead of TDF-based. And one thing, and it was in the evidence and it's worth focusing on, PrEP is different from, PrEP is treatment that's provided to patients who have not yet been infected with HIV. And so PrEP is not something that will be taken, necessarily taken, for a lifetime. But instead, PrEP is used seasonally. Users are frequently very young. And what our experts said, again, this was something that was very evidence-based and it was argued, is that for these patients, there was no clinical benefit. And that's the key, is that there were lab test differences, and the way that Gilead marketed was to say that there was a benefit to your renal health, there's a benefit to your bone health. When that was not established, and there... So DHHS, though, had the studies and also thought that there was a health benefit? For some patients, and I think this is why the record was factually, you know, it was factually complicated. Nevertheless, the fact that there was indeed benefit for some patients who had renal conditions or bone conditions that would make them vulnerable to the effects of tenofovir, that was established by... That was indeed understood for many years prior to the study that was done comparing Genvoya, which is the new drug, to Stribild, which was the old drug. One was TDF-based, one was TAF-based. But again, and the reason why this is really a factual issue that should have gone to the jury, is that when a manufacturer is making representations about the safety of its own drugs, it's predictable and appropriate that providers and patients are going to rely on those representations. And that is why it's appropriate to say that what Gilead did here was really to coerce a change... I guess I'm just confused, though, because I don't understand you to be arguing that Gilead deceived DHHS. And so if they didn't, then how did they deceive the public by basically kind of saying the same thing that DHHS was convinced by? Because again, DHHS did not say that it was appropriate to move patients, all patients over. And indeed, current guidance from the CDC for PrEP is that patients should not be switched if they are... Meaning today? Or current, meaning then today? As of then? As of the trial record, Your Honor. So in other words... Wait, but this is at the summary judgment stage, right? I'm sorry. I'm sorry, Your Honor. Correct. In the summary judgment record, the CDC guidance was that patients that were using Truvada for PrEP should not switch. And so do you have a statement from DHHS that says it's not a health benefit to switch? Like that narrows it so much that there was something misleading to not include the narrowing? I believe that what the guidance that was given was, and I can try to get the exact reference from the record, what DHHS said was that a decision about whether to switch patients would depend on the particular characteristics of the patient, cost, and other considerations. So it was not... But that doesn't sound like a definitive it's only good for old patients or it's only good for ex-patients. But again, the question is not whether TAF was a bad drug. No one is claiming that TAF was a bad drug. The issue was whether Gilead, by engaging in marketing that represented to providers, to insurers, to patients, that there was a clinical benefit to TAF over TDF for all patients. Were they being misleading? Because we're talking about a situation where it's not disputed for purposes of summary judgment that Gilead has a monopoly in these CART drugs, a broad market monopoly. We're not... That was also not disputed for purposes of summary judgment that by effectuating this switch from TDF-based drugs to TAF-based drugs, Gilead was able to preserve that monopoly at a cost of billions of dollars to consumers. And so the question becomes only, was the efforts that they made to induce providers to switch potentially exclusionary? I am... And I think part of the problem here is that you have to show that what you're saying improperly induced cross the line to coercion. Your Honor, that's the language that the cases have used. I think what coercion in this context means is that it deprives providers and patients of meaningful choice between the drugs. And the reason, and I think this is something that comes up in the Suboxone case, I know it's a district court case, not binding, but the discussion I think is useful, is that when a manufacturer talks about the safety of its own drugs and it says to providers, this drug is safer for your patients than the drug that you're currently using, that's enormously coercive because what provider is going to want to prescribe a drug that's riskier? What patient is going to want to take a drug that's riskier? And our experts said, and I commend the court to the expert reports of Dr. Hardy, which are in volume 19 of the excerpts of record, and he talks about how this campaign of marketing was so effective at leading both providers and patients to come to perceive TDF as risky and TAF as a safer alternative, and that's what led to the extremely rapid and effective switching over from TDF to TAF. I guess this seems like, you know, this definitely doesn't rise to the level of at least one of the key cases that we've looked at, which is the Second Circuit case in NMEDIA. So what, in your view, is the strongest case for this imposing what I'll call the soft switch analysis? Well, Your Honor, I think that Suboxone is probably the discussion that's most, that's very useful. I know it's a district court case. But I think the NMENDA case, the discussion there is actually very helpful. And I understand that there are differences of degree in what happened. But the defendant there, activists, did not make the drug utterly unavailable. The kinds of claims they were making were different. But remember, in that case, patients were, after generic entry, patients could be, this was an Alzheimer's drug. So many of the patients were going to be naive for treatment. And so the Second Circuit sort of said, well, yeah, you switched a lot of people over, but the generics can come back in. And that's not the way that the Second Circuit looked at it. And I think that's quite right. Because again, we're talking about a situation in which it's not disputed that Gilead has the monopoly for purposes of summary judgment. And it's not disputed that the tactics that they used were extremely effective at maintaining that monopoly. We're not disputing that the consumer effect, the consumer harm, the cost to the public was billions of dollars. And so it's appropriate for a manufacturer to be held to an appropriate standard that ensures that they do not engage in misleading marketing. And again, that what must be believed document, I think, is so important. Because what it says is what must be believed is that there's clinical benefit for all patients and they did not have evidence of that. There was no evidence to suggest that there was clinical benefit for all patients. Can you just give me your best sight, though, for the idea that it was predictable in advance that there were patients who it wasn't a benefit for at the time? I would read Dr. Hardy's report in 19-ER because he goes through his discussion of why he would not have, had he known the information, he actually, I think his rebuttal report, both the opening and the rebuttal are in the excerpts of record, volume 19 of the excerpts of record, Your Honor. He goes through in his rebuttal report a number of the marketing techniques that Gilead used to try to persuade people to make this switch when it wasn't warranted. He explains in both the opening and the rebuttal report why it simply wasn't true that there was clinical benefit for most patients. And again, the PrEP example, I think, is one that helps to illustrate this. And PrEP is a huge factor within what Truvada was used for and what the generics would have replaced Truvada for. But because of this switch over to DSCOVI, DSCOVI was able to take a significant part of that market share. If they did that improperly, that is all that the plaintiffs have to show to establish a violation of Section 2. The damages from that alone are enormous. And again Okay. We have you over your time. I think we understand your argument and maybe we better go to your colleagues since you are dividing time. Thank you very much, Your Honor. Thank you. Good morning, Your Honors. Hamish Hume for the appellants. I'd like to begin with question one on market power and then I'll address the issues on question two in the verdict form. Your Honors, the trial court committed reversible error by making a pure error of law in failing to grant summary judgment to the plaintiffs on the issue of market power. That issue of law is that in an activist case, the competitive price is the price after generic competition begins. I'd like to emphasize two points that I think inexorably support and demonstrate that rule of law. The first is that the Supreme Court and this Court have repeatedly said the purpose of a market power inquiry is to determine whether the alleged anti-competitive restraint actually has the potential for anti-competitive effects. It's focused and tailored to the allegation of the alleged restraint. That's straight out of FTC versus Indiana Federation of Dentists. This Court said the same thing in the flaw of the Hollywood Foreign Press case. There are a number of cases that say that that we cite. Here the allegation is that there was an agreement to delay generic competition. That's the allegation. Therefore, the inquiry must be focused on the competition between generics and the branded patented drug. That's the focus of the inquiry. The second point is that unlike cases where a court has to predict what would happen if an alleged restraint stopped being in place or has to predict what the effect of a challenged merger might be on a market. Here, in an activist case brought after generic competition finally does occur, there's actual market data to see what happens. In this case, it's undisputed that after generic competition finally began, the prices for Atripla and Truvada, the two drugs at issue in this trial, plummeted by over 90%. The sales moved dramatically, 80-70% very quickly, over to the generic. That market of the branded drug and its generic competition had an enormous difference in price when generic competition began, a 95% drop. That's not disputed. The Court did not deny summary judgment by saying that was disputed. It is not disputed. It's an unusual case without a market definition, of course. You would agree with that. Let me just ask you, are you basically, your position is the market power has to be analyzed essentially only with an eye toward the price effects? Yes, Your Honor. How do you, you're well familiar with these other cases, functional interchangeability and also Illinois Tool, which says a patent could give you market power, but not necessarily. Yes. How do you square your position with those cases? Your Honor, we're not asking for a presumption here about market power. We're saying, and Judge Underhill in the Agrinox case addressed Illinois Tool and says his reasoning tracks our reasoning. We highly recommend reviewing that decision because I think it's exactly correct. We're not saying there's a presumption. Some patents are worthless. He says that. If the patent is worthless, then when generic competition begins, you're not going to see a big drop in price. You're not going to see 95% drop in price in virtually all the sales moving to the generics in that market. You will not see that. That's because the patent is worthless. If the patent is valuable, it's precisely because it has market power. The ability to exclude the generic competition is what makes the patent valuable. The competition that's being targeted here is precisely the competition the patent prevents. If I understand you correctly, you're not denying that there is a broader market in which drug A is competing against other HIV-branded drugs, but that for the purpose of this particular what you allege to be anti-competitive restraint, the real market is A versus its generics because the whole point of excluding a generic is that it's going to compete with brand A, not B, C, and D. Would that affect damages? To the extent A is competing against B and C, you're saying ignore that competition. That could affect us, but for the purpose of the conduct that we're worried about, we were really worried about the artificial lengthening of the time in which there would be no competition essentially against the equivalent of ourselves, of A. For the purpose of this particular restraint, the competition that Gilead was worried about was the competition of an equivalent to itself and not really worried about, it was also competing at the same time against these other drugs and quality and other things, but it was also worried about competing against the generic equivalent of itself. That's the competition it was trying to stave off. For that purpose, because they are by definition the same essentially, it was only going to compete against its generic on price. That's correct, Your Honor, and I think you've got it exactly right. There may be other inquiries involving these drugs in which you would need to look at the brand-on-brand alleged competition. By the way, it was overwhelmingly with other Gilead drugs and the TAF switch, but yes, other market inquiries might focus on that. Sorry, I just wanted to say, there could be a scenario in which a brand, there is no generic yet, they have a patent, but they're just really not that effective against other brands that are slightly different, and then when that generic was introduced, there would be really no change because they just weren't that good of a product to begin with. I think what you're saying here is there's enough evidence that this brand was unique essentially in its effectiveness or whatever, safety or whatever, that it was to the extent the competition against its generic would be actually quite great because it would be competing only on price. Enough people would just want this particular drug, so the competition from the other options was not so great that it essentially negated the effectiveness of staving off the generic. Am I getting that more or less right? I believe so, Judge Song. I believe you are, but I would like to emphasize one or two points. Another way of thinking about it, which is saying the same thing, I believe, is that if there is significant competition between the brands on price, then you will not see the dramatic drop in price when generics come on the market. The effect of that brand on brand competition on price is, quote, unquote, priced in to the brand at the moment the generic competition begins, and Judge Underhill says exactly that on page 669 of the Agrinox opinion. So I think you don't need, and in that opinion, he denied discovery into what the other branded drugs were doing. He says, we don't need to look at that. All we need to look at is what happened when generics came on the market, because if the price dropped dramatically, we know that the brand is charging a higher price than the competitive price. Now, if we are talking 10 percent, 15 percent, maybe then there is an issue. But if it is a 90 percent drop, we know that that is a super competitive price. To illustrate this, I would ask the Court to indulge in its imagination for a moment, and hypothesize the most egregious pay for delays deal that you can imagine. A brand company pays $100 million to a generic, and they stipulate in writing, you are going to settle for year X, and that is when you will enter. If we weren't paying you the $100 million, you would insist and we would agree that you could settle on an earlier date, three years earlier. Because of the $100 million, you are going to come in later, pure pay for delay. In that case, would we be worried? To know if there is anti-competitive effects, would we be worried about anything other than whether generics drove the price down? Would we be worried about whether the branded drug competed on things like innovation and safety and ease of use? No. You wouldn't care at all about that. You would simply say, you have delayed the competition that matters between the brand and the generics. Whatever the brand was doing vis-a-vis other brands is priced in. We just want to see what was it charging for those three years of delay versus the generic competition that would have driven the price down. That is the inquiry. That sharpens the focus as to what really matters here, and it really is that simple. Other than Agrinox, I think the lower courts are having trouble seeing that it is just that simple. You focused on super competitive prices, but it is interesting that you didn't cite the Rebel Oil case, which I think the district court did. It is not in your brief, but that case talks about not only super competitive prices, but also restricted output. How does your position square or not square with Rebel? Your Honor, a couple of things. It just seemed very unusual to me that that case was not cited. Your choice. It is your brief. Well, I think what you are seeing is that the market power inquiry and the activist type case is a little different in other cases. On restricted output, we would cite the court to the Epic the Apple case at page 975, and there has been another recent case that also said really all you need to do, this court rejects the notion that you need to look at reduction of output if you have clear direct evidence on price effects. In Epic Games and in one of the recent cases, it is telling that the Applees don't even argue this point about restricted output. If you were going to get into it, it is restricted output when you agree to restrain the amount of generic competition, but it really isn't when you have direct evidence of a price effect that is this dramatic. I don't think the court is really going to be looking for that there is a relevance. You just stop at the price issue? Yes. That is because, again, imagine a blatant case that is clearly a pay for delay. What would the court worry about in the market power inquiry? Why would you be worried in that blatant case? Well, what about restricted output? You wouldn't be worried about that. You would say there is an obvious price effect that if the generics had come in three years earlier, the price would have been lower. That is the market power inquiry. It seems sort of circular, though. You are basically saying we know the market is just the brand and it is generic because there was a price drop, and therefore, because there is a price drop, that is the market. How do we know that we don't have to look at the other drugs that are competing to define the market and figure out what the competitive price is? There could be other competing HIV drugs that are charging a similar price to the brand. To be clear, I am not saying that you know it is the relevant market because of the price effect. It is the relevant market because that is the market that is being targeted. That is the competition that is being targeted by the alleged restraint. As Judge Sung was saying, that is the only competition or market that matters for purposes of this allegation. Whether there is market power depends on whether the patent had value or was worthless. You can see that by whether it was able to charge price. But market power in this narrow market that you said you are only going to look at? It is charging the price in whatever market you want to put it in. It is charging that price. Whether it is super competitive depends on which market you are looking at. That is right. The market you are looking at is the only market being challenged by this restraint is the competition between the brand and the generic. If that competition didn't have a major price effect, then you would see that. You would see that there wasn't a huge drop when generic entry began. It is undisputed here that there was a 95% or 90 plus percent drop in that price. If I understand, I just want to make sure I understand, so I am going to take it to drugs that I am familiar with. Just as by analogy as a hypo, let's say allergy medicine, there is Claritin and there is Sudafed. Someone who has allergies might take one or the other because they are both effective. But then there might be another someone who says, I prefer Claritin, it is more effective or it doesn't make me sleepy and I only choose Claritin. In the world of allergy medicine, there is both some people who might choose one or the other and be brand indifferent and then there are some people who really just want this particular type of allergy medicine. With respect to that, Claritin is going to be worried about competition with the other types of allergy medicine, but they are also going to be worried about competition in the market of people who really only want this particular type of allergy medicine. They are going to be worried about the generic because then they are only going to be competing against in the sub-market of people who can only want Claritin, only use Claritin. Their only competition is the generic. You are saying for the purpose of determining whether this delay of the competition from generic, what we should be looking at is that sub-market because that is sub-market of people who really only want this particular drug, their only competition is the generic. Correct. Okay, and then maybe there might be a scenario in which A is really just not that effective. So if a generic is introduced, it is not going to change anything because there are not that many people who are preferring only A, but you would see that essentially when the generic was introduced because essentially not much would happen to the price because not that many people are preferring A over B based on price alone. That is exactly right, and I suspect your Claritin example... Then there is, because when the generics were introduced here, there was such a big drop, you are saying that we can draw the inference, but that must mean there was a market, a sub-market where people only wanted A. As soon as A became available cheaper, they had to drop the price. That is exactly right, and in the Claritin example, you probably would not see a big drop because there is price competition between Claritin and Benadryl and the others, and it is the branding effect. People do not always buy a commodity for a retail consumer product like that, but for prescription drugs, the law requires the pharmacies to switch to the generic. It is much more, the whole regime here, the Hatch-Waxman regime is designed and focused, and the Supreme Court says this in activists, and I really want this whole argument is rooted in activists. They did not address market power as a motion to dismiss decision, but if one reads activists and thinks about the nature of this case, I think it is clear that it leads to this conclusion and to the conclusion you have articulated, Judge Sung. It talks about super competitive profits, and when it says super competitive, it means above the price that would occur with generic competition. Everything it says is about the competition between the brand and the generics, and if the price is not higher, then fine. Then you are not going to see market power, but when it is 90 percent drop after the generics, you know the answer to the inquiry. We are well over your time. I think we have to cut you off. Sorry. Thank you. Thank you, Judge Friedland. May it please the court, John O'Quinn on behalf of the appellees. I want to start where the argument just finished and make two overarching points to begin with. First, procedural and then substantive. So the argument you just heard my friend make is an argument arguing this court should reverse the denial of summary judgment. That is procedurally inappropriate. It would violate the Seventh Amendment. It would be inconsistent with the Supreme Court's decisions in Ortiz and Dupree, both of which hold that the only thing that you can appeal from without having preserved this at J-Mall, and they did not raise this as a J-Mall issue, the only thing that you can appeal is a purely legal issue. Judge Chin rightly denied their motion for summary judgment in very well-reasoned opinion. I'd point you to excerpts of record 5792 and 5797 in which he talked about the evidence that there was competition between the brand drugs. He explained that, quote, in the pharmaceutical context, there are reasons to be cautious about finding power just based on super competitive price because a brand drug will always be more expensive, often for reasons that are not anti-competitive, end quote. He found, as this court recently reaffirmed in the Google Play case, that there are inherently in determining what's in the market, all kinds of fact questions. I think that you could view this as a purely legal question, though, because they're basically saying the price drop itself shows you that it was super competitive pricing just as a matter of law. So if we just assume that for a second and get past the waiver, we understand your waiver argument. Could you address the merits of it? Yeah, I'll absolutely do that, Judge Friedland. One point on that, I mean, once it's actually gone to the jury, I think it violates the Seventh Amendment to then say, well, we can actually look at the summary judgment record. So I don't care, even if you dub this as being a pure question of law, it's still a question of law that was based on facts. And there was a factual record that was considered by the jury. Now, a couple of points on the facts here. Number one, a plaintiff's position to treat the competitive price as being essentially marginal cost as a matter of law is an extraordinary proposition. No court has adopted that. The Agrinox case that he cites is admittedly an outlier. Every other court to have considered the question has rejected it because they all understand that what it would mean is that every brand drug is then in a market of one. And the reason the brand drug would be in the market of one is because the generic doesn't have the R&D costs. The generic doesn't have the advertising costs. And to be clear, there's a little misleading going on when there's, I don't mean intentionally, but when there's the suggestion that the price dropped upon generic entry. It's true the generic price was significantly lower than the brand price. But to be clear, the brand price here for both Truvada and Atripla never dropped. You can look at excerpts of record 2813, that's volume 11, and also excerpts of record 2816. And I'd also point you to trial exhibit 8168, which is available at docket 2155-02, page 20. And what you can see is even after generic entry occurs, Gilead's price for Truvada stayed the same. Gilead's price for Atripla stayed the same. But probably almost no one was buying it. Right. I'm sorry, I just... Probably almost no one was paying that price though because no one was buying it. Right. Absolutely the demand dropped and that actually then goes to why it would be, it's actually emblematic of why it would be inappropriate to look at the market as just being limited to that drug. And that's because the fact is after looking at 80 million prescriptions, 2 million patients, 11 years worth of data, as our expert Dr. Wu explained, they had real world switching happening between branded drugs. And what I'm referring to you can see at excerpts of record 2792 and supplemental excerpts of record 626. And what Dr. Wu testified at SER 622 is about what were people doing in real life. And what he explained was that Gilead for both of these drugs lost market share before generic entry. That's at SER 628. And indeed that they were sales by the time of generic entry, Truvada sales had dropped by 90% compared to the peak. Dropped by 90% ER 668. And so what you're seeing, and this goes to one of the questions you had a moment ago Judge McEwen, what you're seeing is that there is vigorous competition that's taking place between a variety of different drugs, including, yes, there were other Gilead drugs, but there was drugs from Vive, drugs from GSK, and Dr. Wu testified about that. And that drop in market share, significant drop in market share, which predates generic entry, shows that there again is at least a fact about, a fact question about what is competition, what is the relevant market for competition. That's what I'm still wrestling with, is what is the relevant market and how is it analyzed in what is here called a zero price market because of the unusual situation of the consumer. It's not Sudafed, it's not the over-the-counter situation, it's this prescription drug at a zero price option. Where does that fit in? Yeah, Judge McEwen, I think you put your finger on it. This is an unusual situation because you are in, number one, it's a market with large sunk costs, which I talked about a moment ago, and number two, it is a heavily subsidized market. And Dr. Wu testified about this extensively at trial, explaining that the people who are making the decisions, the consumers, the ultimate beneficiaries here, price wasn't the relevant or something along those lines, and so that what you end up with is vigorous competition on other dimensions. And the Supreme Court going over- I'm sorry, I get confused about that because I thought part of the problem is when the generic is introduced, essentially health plans are requiring use the generic because it's cheaper. Yes? I mean, isn't that part of the problem of why the drug company doesn't want the generic? Because as soon as the generic is introduced, that generic is going to get dispensed? So, Judge Sung, under many states' laws, you were right that if you have an AB therapeutically rated equivalent, a drug gets automatically substituted. And the benefit of that for generic companies is, number one, they don't have to engage in the extensive R&D costs that are involved in innovating these types of life-saving drugs. And number two, they don't have to engage in any advertising. It just automatically gets substituted in. And so we're in a very, very strange market. And if we're talking about Coke and Pepsi, they're both out there vigorously competing along a lot of different dimensions, not just price, but there are differences in them. And when you have the substitution, that means that the generic can come in at a lower price as a function of state law. That's going to always be true. And so the upshot of the plaintiff's position, which the Supreme Court and activists didn't remotely suggest, is that you can just define a market of one just based on price drop. That would be an extraordinary proposition. No court has remotely suggested that. Activists didn't essentially say you can do away with the inquiry into market power. And what I hear that the plaintiff's arguing is essentially that you can do away with that inquiry because from the price drop alone, that's enough. That's inconsistent going all the way back to the Supreme Court's decision in DuPont, which made clear that, quote, in considering the relevant market for determining control of price and competition, no more definite rule can be declared than commodities reasonably interchangeable by consumers for the same purposes make up that market, end quote. And that's what you have here, is you have reasonable interchangeability, not theoretical interchangeability, and that was, you know, the Regeneron case in the Second Circuit was decided on a motion to dismiss. It found that the district court had erred in dismissing because it looked solely at theoretical interchangeability as opposed to actual interchangeability. Here we had a trial, we had a six-week trial about the actual interchangeability of drugs, about how the demand for Gilead's products, for these specific products dropped substantially as a result of the introduction of these other products. That's ultimately a fact question. I mean, this court has emphasized again and again that ultimately what you're faced with in deciding what is the relevant market is no one test, you know, again, the plaintiffs put a lot of emphasis in the so-called SNP test. You know, this court in several cases, including Optronic versus Ningbo, made the point, quote, there is no requirement to use any specific methodology in defining the relevant market. And of course, the Supreme Court in Brown-Schuh identified a number of practical factors, which were, how do consumers view the competing products? And here, the consumers are looking between Veeve's products and Gilead's products and other Gilead products, how do the participants view the products? And, you know, you can see at ER 2995, for example, Gilead identifying who were its competitors, GSK, BMS, and Merck. And that is exactly the point that Judge Chin, in his thoughtful opinion on this and denying them summary judgment and allowing the issue to go to the jury, explained that there are a lot of complicated facts here, and that is exactly when it should go to the jury. And at the end of the day, the jury came to the conclusion that a minimum that the plaintiffs had overreached. You know, as Judge Chin put it at ER 41, they took an extreme position with respect to the And the jury ultimately found that they didn't carry their burden of proof. And I don't think there's a basis for this Court to revisit that. Now, I do also want to say, and I'm happy to take questions on this, but I'm also happy to move on to other topics as well. There are two independent bases on which you can affirm the jury's verdict. The first one is that the Court was right to allow the issue of market power to go to the jury, and the jury was properly instructed here. And to the extent you have any doubt about that, compare the actual jury instruction to the one that plaintiffs urged at ER 1100. The jury instruction that he gave on market power was more favorable to plaintiffs than, frankly, what they had been asking for, explaining that everything had to be through the lens of economic substitutability, and what they complain about is language out of case law. But then you have an independent basis for affirming the jury's verdict, which is that there was, in fact, no reverse payment. And question two, can you address the FTC's concerns as expressed in their amicus brief? So, Judge Sung, I will try to. I'm going to confess I'm not entirely sure what the FTC's concerns are as applied to this case. And the reason that I say that is because, you know, the defendant's argument was that there was no payment at all. Not that it was small compared to some metric out there, but that there was no exclusivity, and so there was nothing of, you know, of discernible value or substantial value that was conveyed. That's not an argument that the FTC really addresses. And, in fact, the FTC addresses a number of points, frankly, that plaintiffs do not make in their brief and, therefore, are not actually really before the court on appeal. The FTC makes a number of comments about the relevance of patent merits. And, you know, to be sure, issues like causation and damages don't exist in FTC cases, but they do exist in private plaintiff cases. And patent merits, as the First Circuit explained in NXIVM and a number of district court cases have all explained, patent merits are critical to determining the issues of causation and damages. Plaintiffs themselves put on days' worth of experts about patent merits or lack thereof in their view, and there is a reason for that. And one last point that I think is different, at least from how the Supreme Court was looking at the issue in activists itself, is there's a question in this case, and the FTC doesn't grapple with this, about whether there was a payment at all. You know, in activists, there was a payment. There was a question of what it was for and how to consider it. Would it be any competitive? The Supreme Court was just dealing with a motion to dismiss and saying, can these cases be actionable or does the scope of the patent test apply? Court concluded the scope of the patent test didn't apply. The question in this case was, was there a payment at all? And was it to induce delay? And for the patent merits, and what the but-for entry date would have been, helped to eliminate the question of whether or not there was a payment at all. Let's just assume there is evidence of a payment. And so on this reverse payment question and the jury instruction, and leaving the FTC out of it, it seems to me there's two aspects to that. According to activists, there's the largeness or size question, and then there's the unjustified inquiry. And my question is whether those were collapsed here and whether that was error on the part of the district court. So they were not collapsed, and there's no error by the district court. I mean, again, first of all, you can't just assume there's a payment. That's what the whole case was about, Judge McEwen, was whether or not there was. And as I was saying, patent merits, you know, picking the but-for date, knowing what it is, illuminates whether or not it took something to induce them to agree to a later date than that. So the patent merits were relevant. Now, your question about largeness, and, you know, when you get to the issue of reverse payment, I think it's important to recognize plaintiffs didn't move for JMAW. They're not making any arguments about the sufficiency of the evidence. They're just quibbling about the jury instructions. And they're not even saying that any of the jury instructions were wrong. Well, that was my question is, is there any challenge, actually, to the jury instructions? So their challenge is not that any of the jury instructions were legally wrong. Their challenge is that the district court would have, could have, should have said more. And the district court, I think, gave well-reasoned explanation for doing the jury instructions exactly the way that he did, and frankly rejected because he viewed some of their positions as loading the dice. So, for example, if you look on the question of large or largeness, if you look at what they had proposed, it's ER 1626, the district court rejected that at ER 493, that's in volume 2, as being, quote, overly one-sided. And that it, you know, he recognized, as we argued, that it assumed the conclusion. The instruction that they wanted was to say, quote, you can find the total reverse payment here as large if dot, dot, dot. Well, the question is whether there was a reverse payment at all. And then second, you know, their argument of it's large just compared to essentially avoided attorney's fees, that's inconsistent with the Third Circuit's decision at Wellbutrin, 868, F3rd at 168, which identified that brand companies are going to be incentivized to pay more than just attorney's fees because of risk aversion. It's got, you know, it is, one is not, you know, a valid metric for the other. And so at the end of the day, you know, their only complaint is to essentially say, well, large compared to what? And that's where I think, you know, first of all, large is a lay concept that a lay juror can understand. And second, this Court's recent admonition in the Google Play case, or the Google Play Store case, you know, recognizes that when you're considering whether the district court abused its discretion, you have to consider, you know, what were the theories at trial? Defendants were not arguing this was not large compared to some other metric. It was— The verdict form doesn't have the word large in question, too, right? It just asks whether there was a payment. That's right. That's exactly right. And by the way, I mean, Activist itself, you know, yes, it talks about large payments, but it doesn't actually link that up to any one particular thing. You know, it talks at different points in time. It refers to, quote, size as an independent consideration separate from, quote, scale in relation to future litigation costs. That's page 159 of the Activist decision. And then without referring to size, it just notes that a payment, just a payment, it doesn't even talk about size, quote, may amount to more than a rough approximation, to no more than a rough approximation of litigation expenses or reflect compensation for other services, the generic as promised to perform, or there may be other justifications. That's at 157. There's nothing in Activist that ties large to a single metric. And again, we were not arguing, the defendants were not arguing, well, this is not large compared to this. This is not large compared to that. The argument was, this is not a payment, or it's not a payment of sufficient certainty, of sufficient determinability to have had the effect that the plaintiffs wanted to allege. So again, either way, this case on what went to the jury is ultimately about the jury instructions. That's really the only thing that's properly preserved here. And the district court didn't commit any legal errors. And the district court would not remotely abuse his discretion in turning back some of the overreaches that plaintiffs wanted in the jury instructions. I'm happy to answer other questions, but I'd also like to... I was hoping to ask you to address the renal benefit issue and whether it affected all patients. Yeah, I'd be happy to, Judge Friedland. Let me take two steps back on that. First was, you know, I heard a suggestion from my friend that if you agree with them on this, the so-called TAF switching product hop issue, that that would require a new trial as to the reverse payment issue. I don't... First of all, that's not an argument that we saw in their brief. It certainly wasn't one that was developed in the way that this court required at Batchley at 957 F3rd at 978, you know, two sentences without citation to legal authority is not enough as this court has held. But I don't even understand, like, the logic behind it. It has nothing to do with... Maybe this is because of the monopolistic scheme. I actually didn't ask them when they said it, but maybe it's because of that argument that it's all bundled together. It might be that that's... So, you know, I can... I'll break that apart. I mean, certainly it would have no bearing on market definition, nor would it... Whether there was reverse payment. Maybe it goes to the issue of whether or not there's a course of conduct, a scheme that can be made here. There can't be because what they essentially... Their whole theory here for scheme... Why don't you... Before you run out of time, why don't you talk about the merits of the... I'd be happy to. No, no, absolutely would be happy to. And, you know, this is the other... The other step back on that is, of course, the whole question here is, what does a product hop theory actually require in the first place? They jumped right into arguing, oh, there was something that was misleading here. And I would definitely want to address that head on. But before you ever get to that as a legal matter, the question would be, does that matter? And I think if you look at the Second Circuit's decision in Nemenda, this court's decision in Allied Orthopedic, and the Third Circuit's decision in a case called Milan v. Warner-Chilcott, it's at 838 F3rd at 440. They all require making the product actually unavailable. That's what you've got to have in order to have one of these product hop type schemes. Because otherwise, you're just conflating fraud into antitrust law in kind of a boundless sort of way, where you would be inviting exactly what this court said in Allied Orthopedic would be, you know, unmanageable. Which is deciding, well, okay, have you over-marketed the product? Is the product as... You know, was it worth it for these changes to have been made in the first place? And I respectfully... The notion that threatening that the product would become unavailable could be equivalent to being unavailable. I don't know. I'm not sure you really have to show that it was totally unavailable. No, no, I agree that the line is not that it's like actually literally got to be gone from the market. But I think both in Nemenda and in the Suboxone case, in both cases, there was an announcement that the product was going to be withdrawn. And that had the effect of people functionally rendering it unavailable. That was like a hard switch. That was the hard switch. That's exactly right. And the argument that I think you're hearing today is essentially an argument about why something that would be no more than what Nemenda cast as a soft switch should be actionable as a matter of law. No case stands for that proposition. And indeed, I think that that would run afoul not only of what this court held in Allied Orthopedic, but also what the Supreme Court held in Pacific Bell. I mean, you're already at the outer edges of antitrust law with this theory. This product type theory is not one that's been recognized by the Supreme Court. Well, maybe this sort of gets back to the same thing. I think, as I recall, Allied Orthopedic talks about a product improvement. And so their claim is that you were misleading because it wasn't a product improvement. So what is the medical evidence about this? Who was affected issue? And whether you said something misleading about that? Yeah, so let me point you to a few things on this, Judge Friedland. First, as Judge Chin recognized, there's nothing in the record that shows that the Gilead was saying anything substantially different from what the Department of Health and Human Services itself said. And indeed, there was a concession. You can see at Supplemental Excerpts of Record 94, they've conceded that we didn't mislead the FDA, we didn't withhold data, that there were no errors in the data at Excerpts of Record 96. They're not challenging the HHS guidelines at Supplemental Excerpts of Record 92. Their expert disclaimed, quote, objecting to the study design for Stribild versus Genvoya et al at SER 102. They disclaimed any issue with the FDA approved labels. I mean, the comparison that was run here between Stribild and Genvoya is a study that was approved by FDA in order to get this drug approved in the first place. And indeed, plaintiffs themselves pled, they pled that TAF, quote, has a substantially lower incidence of significant adverse side effects. That's at ER 2239. So they really do want to put a court in the business of sort of second guessing, well, is it enough and for who? I do want to talk about the for who bit because they repeatedly rely on a Gilead document that identifies 17, I believe it's 17% is the number that they've quoted of people who were diagnosed with either of the conditions. That's at ER 100. Their expert was questioning about this and that 17% just goes to the number of people diagnosed. Diagnosed, of course, doesn't mean the number of people who actually need it. And if you look at the same document that they rely on, this is ER 5672, volume 23. It was a 2010 document. The estimated prevalence of these conditions, the kidney conditions and the bone demineralization was 72% of the patient population. And so you really are basically being asked to, I'm sorry, to treat. They seem to have a theory, though, that even if it's 72%, because there would still be a 28 if I'm doing the math right, that you needed to say that. And I'm wondering if you can speak to this idea that there should have been a way to identify who the people were who didn't need this. Judge Friedland, I don't know that there's any way to know ex-ante who those people would be. This was a point that Judge Chen made in granting summary judgment on this. Number one, these are drugs that are taken over a lifetime. Number two, when you talk about bone demineralization, I mean, you're talking about- Okay, but they said PrEP is not taken over a lifetime. Is that a dispute? So I think there's, I don't know the answer to that question, Judge Friedland. I also don't think that it matters because at the end of the day, it's the same drug. That is, and if you're saying it has benefits, it's the same drug that's going to be used for HIV treatment as it is being used for PrEP treatment. They don't identify any external Gilead marketing materials that make false, that they accuse of making false statements. In fact, they don't really identify. Their expert, if you look at SER 101, I see I'm over my time. Well, let me just ask a follow-up question about this. You say the standard is false. They say because you're talking about your own products, the standard should be misleading. I'm wondering if you have an argument that even if the standard is misleading, it's not misleading. I think that's-  I mean, there's no evidence of anyone having been misled here at all. I mean, if you look, for example, at SER 102, they conceded. There's no evidence that anyone made any changes that isn't prescribing based on the study. If you look at SER 90 and 104, their expert conceded that doctors and patients were not coerced into making changes here. I mean, there's a lot that's sort of layered into this, Judge Friedland. One is, is it misleading? Two is, is it coercion? Three is, is coercion enough? I would submit that if you kind of work backwards, for exactly the reasons this court found in allied orthopedic, this cannot possibly be enough. And factually, you know, their own experts, you can see at ER 6411, found that by the time, at the time of generic entry, as between, you know, as between Truvada and Dyskovy, you've got more than 50% of the population still using Truvada. Now, the whole theory here, I mean, again, take a step back. I think maybe I have to cut you off unless there are other questions. Thank you. I think we have your argument. Thank you very much. I think we still have some time for rebuttal, though. Did we? No, we don't. Or did anyone save time? I'm sorry, I don't remember. Did they use up their time? Yeah, let's give three minutes for rebuttal. Thank you, Judge Friedland. Thank you. I should say that if it's, if it's total, then I will try to use two minutes so that Mr. Hume can have a minute. We did try to reserve, I'm not trying to, I guess I am. We actually have lost track of what happened here. So did we, we took everyone over their time so that, okay. Why don't we give you two minutes and then we'll put two minutes again. That's great. Thank you so much, Your Honor. I do appreciate it. So I do want to address a couple of things that Mr. O'Quinn said at the end. The first one is with regard to the issue of whether, if the issue about the product hop has to go back, why there has to be a new trial that's addressed at pages 52 to 54 of our brief. And Gilead did not contest that in their responsive brief. But is it because of the monopolistic scheme or? For a few reasons, Your Honor. The easiest way to see it is that it's a different market. We said that there was a, there was monopolization of the overall market for cart drugs. And part of the conduct that effectuated that was the pay for delay. And so that, the, the, the market that was at issue would have been different. And the other thing is that because TAF was kept out of that trial, Gilead said, oh, TAF is terrific. TAF, we switch people to TAF. That shows there's competition. That shows that we're innovating. And had they been defending the misleading statements with regard to TAF in the trial, that would have obviously. If I understand correctly, part of the defense was by the time the generics came in, there had already been a drop in the usage. And you're saying that drop was because of the product hop. Exactly right. Yes, Your Honor. And I do want to quickly address the DHHS guidance, because obviously that was, you know, emphasized. What the DHHS guidance actually says is that TAF has fewer bone and kidney toxicities, whereas TDF is associated with lower lipid levels. Safety cost and access are among the factors to consider in the prescription decision. So that's quite different from saying that it's a safer drug for all patients. And there was a statement that there was no evidence about marketing to PrEP patients. That's not true. If you look at Mr. Hardy's expert report, he reviews some of the documents on their website. And this, again, it is revealed in their internal documents about what they were doing. The actual evidence of misrepresentations made to providers and patients, well, particularly providers may be thin, but that's for reasons that Dr. Hardy explained. This was marketing that was done by word of mouth through key opinion leaders in the community. And so it's appropriate for a jury to draw the inference that precisely what they said they were going to do, which is to represent. I think we understand the argument. You're over your time. So if we're going to give your colleague time, we should have to stop. Thank you, Your Honors. Counsel mentioned the Google Play Store case. It's directly on point on this question of market definition. At page 935 of that opinion, this court held that the nature of the claim affects the market definition. There was a complaint by Google that Epic had a totally different market definition when it sued Google than when it sued Apple. And the court said that's okay because the theory of harm is different. And the definition of the market and the market power inquiry depends on the nature of the  That's at page 935 of the Google Play Store decision. Here, the claim is a pay for delay to delay generic competition. So the market power inquiry is, would the pay for delay, if proven, have anti-competitive effects? The answer to that question is given by what happens when generic entry actually occurs. There's actual data that gives you the answer. If there's a drop in the prevailing price, and it is the prevailing price, not just the price of the generics, take it all into account. That's why I mentioned not just the 90 plus percent price drop, but that most of the sales went generic. That tells you the prevailing price, and it dropped dramatically. Where under those undisputed facts, market power is shown. That's the basic on page 159 to 60 of Activists. The Supreme Court said lower courts will figure this out under the rule of reason. And they will tailor. It's a sliding scale of reasonableness. The court has to separate out what's relevant to what's not relevant. That is not happening. We need this court's help to make sure it happens. There's the combination of the complexity of antitrust law and the fact that most cases are very different from this fact pattern. Plus, very talented defense lawyers has led to a hopeless quagmire on this issue of market power. Agrinox gets it right. Zettia and the Leiterdarm case get it right, but they're not as clear as Agrinox. Final point, if this court is not going to see its way clear to adopting the clear rule of law and reversing on market power, to avoid making the problem worse, we would ask the court to try to decide the market power issue on the narrowest, most case-specific grounds possible, a procedural ground. Finally, there were talk about instructions. The key point here- I'm sorry, you want to lose on waiver then, if you're going to lose? Is that what you're saying, basically? We don't want to lose. We think those arguments have no merit. This case is going to have implications beyond just- this decision will have implications beyond this case. That's all I meant to emphasize, Your Honor. On instructions, the Cedabay court, Sutter Health, which reversed a jury verdict, says on page 6888 and 695 that it's the cumulative effect of all the instructions. There was an error in the instruction on large. It's found at ER 492 to 493, where the court failed to tell the jury that the payment is large if it's greater than avoided litigation costs. How do you deal with the fact that the verdict form just asks whether there was a payment at all, and the jury says no? Sure, it would ask whether there was a payment to delay, which for that, they had to look at all the instructions to understand that. The larger point, the cumulative effect of all the instructions that we challenge in our appeal was to convert a case that should have been about was there a payment, and if so, why, instead became a case about was it reasonable for Teva to settle? Was Teva concerned about losing the patent case? If the only issue was the jury instruction related to the large and justified, would that merit a reversal in a new trial? Yes, it would. If it were only that one issue? Yes. Well, I think it would because it's so central to the activist inquiry, and it creates an objective test that focuses the jury on the central question. Instead of which, but the cumulative effect here, and I want to just very briefly emphasize the waiver, the cumulative effect of the instructions with the evidentiary rulings. The court said on ER 2592 that it recognized the subjective testimony of the Teva in-house counsel who testified under the privilege waiver was not- Okay, I think we're way beyond here. You're beyond your time and now beyond the topic, so I think I'll cut you off. Thank you both sides for the very helpful arguments. This case is submitted, and we are adjourned for the day. Is there a quorum for this session? Then we're adjourned.
judges: McKEOWN, FRIEDLAND, SUNG